IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | Case No. 8:10CR447 |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | FINDINGS AND RECOMMENDATION |
| ANTHONY E. HOLLINS, ) | |
| ) | |
| Defendant. ) | |

This case is before the court on the defendant's Motion to Suppress (#18). A hearing was held on the motion on February 18, 2011, and the transcript of the hearing (#32) was filed on March 14, 2011.

The defendant, Anthony E. Hollins, was a passenger in a Ford SUV that was stopped by officers of the Omaha Police Department on July 31, 2010. The officers made the stop because the SUV lacked license plates, and the officers initially failed to see the "In Transit" sticker that had been affixed to the SUV's tinted window.[1] After the initial stop, events ensued that led to the impounding of the SUV and the discovery of a firearm in the SUV's center console. An indictment (#1) filed on December 14, 2010, charges the defendant with possessing a firearm after "having previously been convicted of a crime punishable by imprisonment for a term exceeding one year" in violation of 18 U.S.C. § 922(g).

The defendant argues that either the initial stop was invalid or the officers were required to terminate the stop immediately after they spotted the In Transit sticker, and

---

[1] The court has taken judicial notice of Revised Statutes of Nebraska § 60-376, which sets forth the state's In Transit sticker requirements (see #32 at 4:11-20).

therefore all evidence derived from the stop–including the firearm that the defendant is charged with possessing–must be suppressed (*see generally* #18).

In response, the government argues that the initial stop was valid because the officers had probable cause to stop the vehicle, that the ensuing investigation was reasonably related to the circumstances that led to the stop, and that there was no unlawful detention of the defendant (*see generally* # 24).

## I. Factual Findings

Officer Sean Gardner was the sole witness who testified during the hearing on the defendant's Motion to Suppress (*see generally* #32). Gardner has served as an officer in the Omaha Police Department for four years; previously, he served as an officer in the Elkhorn Police Department for eight years, and he served in the Colfax County Sheriff's Department for one and one-half years (*id.* at 5:7-21). On July 31, 2010, at approximately 10:47 p.m., Gardner and his partner, Officer Checksfield, were patrolling Omaha's Northeast Precinct in a police cruiser (*id.* at 5:22-6:25). As the officers drove west on Ames Street near the 31st Street intersection, they encountered a Ford SUV traveling east on Ames Street (*id.* at 6:25-7:17). The officers observed that the SUV had neither front nor rear license plates and, believing this to be a traffic violation, they decided to stop the SUV (*id.* at 7:13-20, 8:15-18). Gardner turned the cruiser around, activated the overhead lights, and pursued the SUV (*id.* at 9:13-18). During the pursuit, the SUV was between 20 and 40 feet in front of the police cruiser, but Gardner was unable to see an In Transit sticker on the SUV (*id.* at 9:22-10:3). Gardner noted that "it was dark out" and the SUV had tinted windows (*id.* at 10:1-4).

The SUV pulled into a parking lot and stopped (*id.* at 10:5-15). The officers positioned their cruiser about 15 or 20 feet behind the SUV, offset slightly toward the driver's side (*id.* at 10:14-22.) Gardner activated two spotlights that are normally aimed at the mirrors of a stopped vehicle (*id.* at 10:23-11:7). At this point, Gardner was still unable to see an In Transit sticker on the SUV (*id.* at 11:18-20).[2] He could tell, however, that there were two people in the SUV (*id.* at 12:6-13).

Gardner and Checksfield exited their cruiser, and Gardner approached the driver of the SUV (*id.* at 11:21-12:17). When he was within approximately six feet of the SUV, Gardner could see an In Transit sticker,[3] but he did not get a "real good view" of it through the SUV's tinted rear window (*id.* at 13:10-15, 14:23-1, 28:5-11).[4] He could tell, however,

---

[2] *But see infra* note 4 (discussing Gardner's conflicting testimony in a state court hearing).

[3] Gardner also testified that he was "[p]robably about half way between the cruiser and the suspect's vehicle" when he first saw the In Transit sticker (#32 at 18:19-22). As noted previously, the cruiser was stopped approximately 15-20 feet behind the SUV.

[4] The defendant was charged in the District Court of Douglas County, Nebraska, with "essentially" the same offense that he has been charged with in the instant case (*i.e.*, felon in possession of a firearm) (*see* #32 at 19:7-9). Evidently, the defendant moved to suppress the evidence against him in the state case, and on December 13, 2010, Gardner testified during the hearing on that motion (*id.* at 19:11-20:9). In the state case, Gardner testified that he saw the In Transit sticker when he turned his spotlight on the SUV (*id.* at 21:5-22:5). Gardner concedes that his testimony in the instant case differs from the testimony he gave during the state case (*id.* at 22:3-5). During his redirect examination, Gardner explained,

> I'm sure, you know, as you pull up behind the vehicle, you take a look at the whole vehicle. I'm sure if I testified in the first [hearing in state court], as far as visually being able to see something in the back window, I could probably see it from the vehicle. As far as being able to identify it, I wouldn't be able to identify it until I got closer.

(*Id.* at 27:11-16.) The court finds that Gardner was first able to verify the presence of an In Transit sticker when he approached the SUV on foot, at a distance of about six to ten feet.

-3-

that the In Transit sticker was "dealer issued" (*id.* at 22:16-23:11) and "appeared to be legitimate" (*id.* at 32:15-19).

At about the same time that Gardner saw the In Transit sticker, the driver of the SUV opened his door (*id.* at 12:18-20, 13:16-22). The officers told the driver to get back into the SUV, and the driver complied (*id.* at 12:20-13:1). Gardner then made contact with the driver and asked him for his driver's license, the insurance card, and the "paperwork for the vehicle" (*id.* at 13:2-5).

The driver identified himself as Mr. Weaver and said that he did not have any identification with him (*id.* at 14:8-10). Gardner obtained some information from Weaver and returned to his cruiser to check the SUV's paperwork and determine whether Weaver had a valid driver's license (*id.* at 14:10-14). Gardner then discovered that Weaver's license was suspended and that he had "two warrants," and the officers took Weaver into custody (*id.* at 14:15-23).

After the officers handcuffed Weaver and placed him in the back of their cruiser, one of the officers asked Weaver whether he wanted to release the SUV to his passenger or have the officers tow it (*id.* at 14:22-15:3). Weaver said that he would like to release the SUV to the passenger (*id.* at 15:4-6). Checksfield then made contact with the passenger–Mr. Hollins–to determine whether he had a valid driver's license (*id.* at 15:7-16:3). The officers obtained information from Hollins, checked his license, and discovered that he too lacked a valid driver's license (*id.* at 15:23-16:3). As a result, the officers could not release the SUV to Hollins, and they began the process of impounding it (*id.* at 16:2-15).

Before impounding a vehicle, officers of the Omaha Police Department are required to conduct "an inventory of the vehicle for any property that's of value" (*id.* at 16:16-20). Gardner inventoried the SUV and found a .380 pistol underneath the center console, which appeared to have been broken and displaced (*id.* at 16:21-17:2).[5] The officers then arrested Hollins "for the gun" (*id.* at 17:7-11).

Gardner testified that during the past four years, he would guess that he has "seen upwards of maybe a hundred sets of In Transits that were fictitious," and some of them "do appear to be dealer-issued" (*id.* at 31:7-17). He added, "There are also dealer-issued In Transits sold at the Kwik Shops for 25 bucks, so they don't mean a whole lot" (*id.* at 23:1-2). Gardner said that because of this problem, he does not "take any In Transits at face value"–even if they appear to be legitimate–"until [he] check[s] the paperwork on the vehicle and the driver" (*id.* at 32:10-14; *see also id.* at 27:17-22). He also said that when he approached the SUV on July 31, 2010, and spotted the In Transit sticker, he made no effort to "look for a date" on it because he preferred "to check the paperwork [to] make sure if it's valid" (*id.* at 31:17-22).[6]

## II. LEGAL ANALYSIS

Because the officers' stop of the SUV resulted in a seizure of both the driver and the defendant, the defendant may challenge the legality of the stop. *See Brendlin v. California*,

---

[5] The center console was located between the driver's seat and the passenger's seat, and it was within reach of either occupant (#32 at 17:15-19).

[6] During the hearing, the court received defendant's Exhibit 101, which is the citation issued to Weaver on July 31, 2010; Exhibit 102, which is the purchase agreement for the SUV; and Exhibit 103, which is the delivery document for the SUV (*see* #27).

551 U.S. 249, 256-63 (2007).[7]  As noted previously, the defendant argues that A) the stop of the SUV was invalid at its inception, and B) even if the stop was valid at its inception, the seizure became unlawful when it continued after the officers observed the dealer-issued In Transit sticker in the SUV's window.  Each of the defendant's arguments will be analyzed in turn.

### A.  The Initial Stop of the SUV

The government argues that the officers' decision to stop the SUV was supported by either probable cause or a reasonable suspicion that a crime was being committed (#24 at 3-6).  The court agrees that the initial stop of the SUV was supported by a reasonable suspicion of criminal activity, and it was therefore valid.

"A traffic stop is a seizure within the meaning of the Fourth Amendment and, as such, must be supported by reasonable suspicion or probable cause."  *United States v. Houston*, 548 F.3d 1151, 1153 (8th Cir. 2008) (citations omitted).  "A law enforcement officer has reasonable suspicion when the officer is aware of 'particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed.'"  *Id.* (quoting *United States v. Martin*, 706 F.3d 263, 265 (8th Cir. 1983)).  "The more rigorous standard of probable cause exists when the totality of the circumstances justifies the belief that a crime has been committed and the person being seized committed it."  *Id.*  In the context of a traffic stop, '[a]ny traffic violation,

---

[7] The defendant concedes that as a passenger, he lacks standing to challenge the search of the SUV.  See *Rakas v. Illinois*, 439 U.S. 128 (1978); *United States v. Barragan*, 379 F.3d 524, 529-30 (8th Cir. 2004).  (*See also* #32 at 33:17-34:9.)

however minor, provides probable cause.'" *Id.* (quoting *United States v. Martinez*, 358 F.3d 1005, 1009 (8th Cir. 2004)).

"Nebraska statutes require registration of vehicles and the proper display of license plates or, for 30 days after [the] purchase [of a vehicle], in-transit tags." *State v. Reiter*, 3 Neb. App. 153, 156, 524 N.W.2d 575, 577 (1994). *See also* Neb. Rev. Stat. §§ 60-399(1); 60-376; 60-3,170. Because the officers were unable to see license plates or In Transit stickers on the SUV while it was traveling on Ames Street, they had a reasonable suspicion that the SUV was being operated in violation of Nebraska law. Therefore, they could conduct an investigative stop of the SUV. *See, e.g., United States v. Peltier*, 217 F.3d 608, 610 (8th Cir. 2000).

The defendant argues that because the vehicle bore valid In Transit stickers, "there was no proper basis to stop the vehicle for lacking license plates" (#19 at 3). It is true that the SUV bore valid In Transit stickers, and therefore no traffic violation had actually occurred. The relevant question, however, is whether the officers had an *objectively reasonable belief* that a traffic violation occurred *based on what they knew at the time*. *See United States v. Sanchez*, 572 F.3d 475, 478 (8th Cir. 2009) ("The determination of whether probable cause existed is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time, and the same is true for reasonable suspicion." (Citation and internal quotation marks omitted)); *United States v. Herrera-Gonzalez*, 474 F.3d 1105, 1109 (8th Cir. 2007) ("Even if the officer was mistaken in concluding that a traffic violation occurred, the stop does not violate the Fourth Amendment if the mistake was an objectively reasonable one." (Internal quotation marks

omitted)); *United States v. Clayborn*, 339 F.3d 700, 701 (8th Cir. 2003); *Peltier*, 217 F.3d at 610.  When the officers decided to stop the SUV, and as they pursued it, they reasonably believed that the SUV had neither license plates nor In Transit stickers.  Therefore, the stop was valid despite the officers' mistake.[8]

**B.  The Continuation of the Seizure After the Officer Saw the "In Transit" Sticker**

The government argues that the investigation conducted by the officers was proper–even though it continued after Gardner realized that the SUV bore a facially-valid In Transit sticker–because the investigation was reasonably related to the circumstances that prompted the stop (#24 at 7-9).  In support of its argument, the government relies heavily on *Unites States v. Clayborn*, 339 F.3d 700 (8th Cir. 2003).  A detailed discussion of this case is in order.

In November 2000, an officer stopped Roosevelt Clayborn after he observed Clayborn driving without license plates.  339 F.3d at 701.  The officer did not see the "temporary license tag" on the car's rear window.  *Id.* The officer informed Clayborn why he was stopped, and Clayborn explained that he did not have plates because he just purchased the car, adding that the car did have a temporary license tag on its rear window. *Id.*  The officer then asked Clayborn for his driver's license, registration papers, and insurance card.  *Id.*  Clayborn was unable to provide a driver's license, though he did produce registration papers and an insurance card.  *Id.*  "During this exchange, [the officer] detected the odor of marijuana coming from the car." *Id.*  A "computer check" indicated that Clayborn's driver's license was suspended, and the officer arrested Clayborn for driving

---

[8] The court notes in passing that the defendant all but conceded this issue during the hearing on his motion to suppress (#32 at 35:16-36:6).

with a suspended license. *Id.* The officer then searched the car "due to the arrest and smell of marijuana." *Id.* During this search, the officer discovered a loaded pistol between the front seats of the car. *Id.* City policy required that the vehicle be impounded and that a "further search of Clayborn's vehicle, including the trunk, [be] conducted." *Id.* "[S]everal packages of marijuana and live rounds of ammunition" were uncovered during this search. *Id.*

Clayborn moved to suppress the evidence obtained from his vehicle, arguing that the officer's "request for documentation and subsequent searches occurred after the traffic stop should have ended." *Id.* "In other words, since the reason for the stop was a lack of license plates, once the temporary license tag was pointed out, the traffic stop should have concluded," and the officer "could not ask for his license and registration because it was not reasonably related to the circumstances that justified the traffic stop." *Id.*

The Eighth Circuit rejected Clayborn's argument. Preliminarily, the court noted that Clayborn did not challenge the district court's finding that the initial traffic stop "was justified and lawful, because it was based on an objectively reasonable, although mistaken, belief that a traffic violation had occurred." *Id.* The issue, therefore, was "whether the documentation requests by [the officer] were reasonably related in scope to the purpose of the stop." *Id.* The court's analysis of this issue merits quotation here:

> Upon stopping Clayborn for no license plates, Detective Hall conducted a very limited inquiry: 1) informing Clayborn why he was stopped and 2) requesting a driver's license, insurance card, and registration. We have consistently held that "[a] reasonable investigation following a justifiable traffic stop may include asking for the driver's license and registration[.]"
>
> Detective Hall's request for Clayborn's registration papers and identification was reasonably related to confirming the vehicle's registration

status and explaining the lack of license plates. The subsequent searches were also justified because of the odor of marijuana, the arrest of Clayborn, and the impounding of the vehicle. *Peltier*, 217 F.3d at 610 (holding that the smell of marijuana gave the police probable cause to search the vehicle); *New York v. Belton*, 453 U.S. 454, 462-63, 101 S. Ct. 2860, 69 L. Ed. 2d 768 (1981) (holding that after making an arrest of the driver of a vehicle, the police may search the passenger compartment of the vehicle); *Colorado v. Bertine*, 479 U.S. 367, 375, 107 S. Ct. 738, 93 L. Ed. 2d 739 (1987) (holding that police are authorized to conduct a search of the entire vehicle after it is impounded, as long as standardized procedures are followed and there was a purpose for the investigation other than suspicion of criminal activity). Therefore, Detective Hall's actions did not exceed those justified by the traffic stop and no violation of the Fourth Amendment occurred.

*Id.* at 702 (citations omitted).

Like the initial stop of Clayborn's vehicle, the initial stop of the SUV in this case was "justified and lawful . . . because it was based on an objectively reasonable, although mistaken, belief that a traffic violation had occurred." *Cayborn*, 339 F.3d at 701. As in *Clayborn*, then, the issue here is whether Gardner could ask for Weaver's license, registration, and insurance card, or whether he was obligated to conclude the stop after he became aware that the SUV bore a facially-valid In Transit sticker. *Clayborn* holds that under these circumstances an officer may make a "reasonable investigation following a justifiable traffic stop" that is "reasonably related to confirming the vehicle's registration status and explaining the lack of license plates." 399 F.3d at 702. In the instant case, Gardner asked Weaver for the same sort of documents that Detective Hall sought from Clayborn (i.e., a driver's license, insurance card, and the vehicle's "paperwork"). The court finds that Gardner's inquiry was reasonable in scope and reasonably related to the purpose of the stop. Therefore, it was valid.

-10-

In support of his motion to suppress, the defendant argues that because Gardner saw the In Transit sticker "immediately upon making the stop," the occupants of the SUV "should have been permitted to immediately proceed on their way" (#19 at 3). The Eighth Circuit rejected this argument in *Clayborn*, and this court is obliged to reject it too.

The defendant also argues that because *Clayborn* is distinguishable from the instant case in certain material respects, this court is not bound to apply *Clayborn* here. Specifically, the defendant argues 1) that "the critical factual distinction there is . . . that the officer [in Clayborn] did not see the In Transits that were, in fact, there as the stop proceeded," and 2) that "as the officer got to the side of the vehicle, having not seen the In Transits, he then smelled marijuana," which provided him with an independent justification for continuing the investigation of Clayborn's vehicle (#32 at 37:6-18). Each of these arguments will be addressed in turn.

First, it is true that Gardner saw the In Transit sticker before he made contact with the SUV's occupants, while Detective Hall did not become aware of Clayborn's temporary license tag until Clayborn called his attention to it. The question in both cases, however, is similar: What must an officer do when he becomes aware that he was mistaken in stopping a vehicle? The Eighth Circuit held in *Clayborn* that if the initial stop is "justifiable" (*i.e.*, "it was based on an objectively reasonable, although mistaken, belief that a traffic violation had occurred"), the officer may conduct a reasonable investigation that is reasonably related to the purpose of the stop *even after his mistake has been called to his attention*. 339 F.3d at 701-702. The initial stop in the instant case was similarly "justifiable," and Officer Gardner was therefore authorized to conduct the same sort of

investigation that the Eighth Circuit approved in *Clayborn*, even though he discovered the In Transit sticker on his way to contact Weaver. Although Gardner did become aware of his mistake relatively sooner than did Detective Hall, both officers discovered their mistakes after the justifiable stops had already occurred and before they conducted their investigations.[9] Under the circumstances, the court is not persuaded that *Clayborn* is inapplicable in the instant case merely because the officers discovered their mistakes in different ways and at slightly different points in time prior to the commencement of their investigations.

Second, the defendant's argument that Detective Hall smelled marijuana before he viewed Clayborn's temporary license tag is contrary to the Eighth Circuit's recitation of the facts in *Clayborn*. *See* 339 F.3d at 701. Although the Eighth Circuit did note that the odor of marijuana provided Detective Hall with probable cause to search Clayborn's vehicle, it noted that Hall's searches were also justified by Clayborn's arrest and by the impounding of the vehicle. *See id.* at 701. In the instant case, Officer Gardner searched the SUV in accordance with the city's policy for inventories of impounded vehicles, and his search was for the purpose of identifying valuables rather than for investigating suspected criminal activity. This sort of search is permissible, *see Clayborn*, 399 F.3d at 702 (citing *Colorado v. Bertine*, 479 U.S. 367, 375 (1987), and in any event the defendant has not challenged the constitutionality of this search (*see supra* note 7).

---

[9] To the extent that the defendant argues that Detective Hall did not become aware of the temporary license tag until after he began investigating Clayborn's registration documents, his argument is contrary to the facts described by the Eighth Circuit. *See Clayborn*, 339 F.3d at 701.

The Eighth Circuit's holding in *Clayborn* is clear: an officer may stop a vehicle if he reasonably (but mistakenly) believes that no temporary license tags are present, and after such a stop has occurred, the officer need not immediately terminate the stop when he becomes aware of his mistake. Instead, the officer may conduct a reasonable investigation that is reasonably related to confirming the vehicle's registration. This holding governs the instant case, and therefore the defendant's motion to suppress should be denied.

One final matter merits discussion. Gardner's testimony indicates that he routinely disregards In Transit stickers because he prefers to obtain the relevant paperwork from drivers. In *Delaware v. Prouse*, 440 U.S. 648, 663 (1979), the Supreme Court held "that except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment." The Court added, "[P]ersons in automobiles on the public roadways may not for that reason alone have their travel and privacy interfered with at the unbridled discretion of police officers." *Id.*

The evidence in this case establishes that Gardner and Checksfield did have an "articulable and reasonable suspicion" that the SUV was not registered, even though it turned out that they were mistaken. In other words, the stop of the SUV was not the sort of "spot check" that the Supreme Court criticized in *Prouse* because it was based on the

apparent absence of an In Transit sticker, not on Gardner's generalized suspicions about the legitimacy of In Transit stickers.[10]

### III.  RECOMMENDATION

**IT IS RECOMMENDED** that the Motion to Suppress (#18) be denied.

A party may object to the magistrate judge's findings and recommendation by filing an "Objection to Magistrate Judge's Findings and Recommendation" within 14 days after being served with the findings and recommendation. The objecting party must comply with all requirements of NECrimR 59.2.

**DATED: April 8, 2011.**

**BY THE COURT:**

**s/ F.A. Gossett, III**
**United States Magistrate Judge**

---

[10] It merits mention that the Nebraska Supreme Court has held, consistent with *Prouse* that an officer cannot stop a vehicle for the sole purpose of investigating the validity of its In Transit stickers. See *State v. Childs*, 242 Neb. 426, 495 N.W.2d 475 (1993).